[No. A093590. First Dist., Div. One. Nov. 13, 2002.]

PETER G. LOEWENSTEIN et al., Plaintiffs and Appellants, v. CITY OF LAFAYETTE, Defendant and Appellant.

## Counsel

Bowie & Bruegmann and David J. Bowie for Plaintiffs and Appellants.

Charles J. Williams, City Attorney; Shute, Mihaly & Weinberger, E. Clement Shute, Jr., William J. White and Osa L. Armi for Defendant and Appellant.

Dennis J. Herrera, City Attorney, and Andrew W. Schwartz, Deputy City Attorney, for City and County of San Francisco as Amicus Curiae on behalf of Defendant and Appellant.

Bill Lockyer, Attorney General, Richard M. Frank, Chief Assistant Attorney General, J. Matthew Rodriquez, Assistant Attorney General, and Joseph Barbieri, Deputy Attorney General, for the State of California as Amicus Curiae on behalf of Defendant and Appellant.

## Opinion

**MARCHIANO, P. J.**—The City of Lafayette (City) appeals from a judgment ordering it to pay just compensation for the delay caused by its

erroneous denial of property owners' lot line adjustment application. Respondents, the Loewensteins, purchased a small, landlocked parcel, intending to use it as part of a division of an existing property without having to resort to the Subdivision Map Act (SMA). (Gov. Code, § 66410 et seq.)[1] When the City refused to allow the desired reconfiguration by a lot line adjustment, respondents obtained a ruling that the City erred and they were entitled to compensation. The central issue presented in this appeal is whether a two-year delay precipitated by the City's erroneous action is an unlawful temporary taking of private property for a public use. Our Supreme Court, in *Landgate, Inc. v. California Coastal Com.* (1998) 17 Cal.4th 1006 [73 Cal.Rptr.2d 841, 953 P.2d 1188] (*Landgate*), resolved the same issue and replied in the negative. Under the facts of this case, we are bound to follow the rationale of that decision and reverse.

### FACTUAL BACKGROUND

In 1984 or 1985, Attorney Peter G. Loewenstein and his wife, Helen Loewenstein, built a 4,400-square-foot home on a lot of approximately three acres in the City. The lot was created as part of a 1977 subdivision of four lots that included a restriction on creating any additional lots and was located in an area of lots with a greater than 15 percent slope, designated as hillside land. The area was zoned R-20, which provided for a minimum lot size of 20,000 square feet, or approximately one-half acre. When they bought the property, the Loewensteins understood that it could not be subdivided without City approval.

Between 1989 and 1992, the Loewensteins discussed building a second home on their three-acre lot. Peter Loewenstein engaged Attorney Colette Stone to investigate the prospect of dividing the lot to allow him to build a second house. Loewenstein told Stone that with a property as large as his, there must be a mechanism by which he could divide it.

In reviewing the conditions of approval of the original subdivision, Stone discovered that the number of lots in the subdivision was restricted to the four existing lots. Stone determined that compliance with the subdivision procedure was an undesirable alternative. Stone spoke with various city planners and learned the requirements for obtaining a lot line revision. The lot line adjustment exception to the SMA stated that the adjustment could not create a greater number of parcels and that the affected parcels must conform to local zoning and building ordinances. (Gov. Code, §§ 66410, 66412, subd. (d).) Unlike a subdivision proposal, a lot line revision involved only a ministerial decision by the City's planning services manager, Michael Henn.

---

[1] All statutory references are to the Government Code.

Stone understood the Loewensteins would need to acquire additional property to develop a second building site under the lot line revision procedure. If they did not purchase a second parcel, the plan to divide their lot would have been subject to the subdivision process, as the lot line adjustment exemption does not apply if the adjustment creates an additional lot. (§ 66412, subd. (d).) Stone's plan was to merge a smaller new lot into the existing lot, then divide the merged property into two lots. Stone would argue that the lot line adjustment only resulted in enlarging the newly acquired second parcel, which was outside the subdivision, rather than splitting the existing lot into two lots.

Stone learned that East Bay Municipal Utility District (EBMUD) had declared as surplus a small neighboring parcel, formerly the site of a water tank. The parties refer to that parcel as the "tank parcel."[2] In early 1996, the Loewensteins purchased the tank parcel for $13,500, which was EBMUD's computed fair market value of property in Lafayette at that time.[3] The tank parcel shared a common corner with the Loewensteins' existing lot, but did not share a boundary. They bought it "as is," knowing that it was only 4,500 square feet and that it had no road or utility access. In his lot line adjustment application to the City, Peter Loewenstein stated that the tank site had no value. However, he knew that it was a legal nonconforming lot on which a single-family residence could be built if the site had utility and road access.

Miller, the neighboring property owner, orally agreed to give the Loewensteins a small triangular-shaped section of his land so that the tank parcel would share a common boundary and could be merged into their lot. Absent acquisition of the triangular piece of Miller's property, they had no access to the tank parcel. The Loewensteins never applied to the City for a lot line adjustment to adjust only the boundary of the Miller property to establish access.[4]

On September 11, 1997, the Loewensteins applied for a three-way lot line adjustment. The proposed lot line adjustment would have added the triangular portion of the Miller lot to the Loewensteins' lot, merged the tank parcel

---

[2]Through Stone's inquiries, the Loewensteins learned that there were two undeveloped adjacent properties available. One of the undeveloped properties was 19 acres and the other was one-tenth of an acre. Ultimately, the Loewensteins decided that acquisition of the larger parcel was economically unfeasible and focused on the smaller parcel.

[3]In accordance with the applicable provisions of the Government Code, EBMUD first offered the tank parcel to the City. The City declined to purchase it and recommended that EBMUD sell the lot to an adjoining property owner, who could merge the land, or create a more useable lot through a lot line revision.

[4]Although Miller did not oppose Loewenstein's plan to build a second house, Loewenstein testified that Miller was "extremely adverse to any type of subdivision."

into the Loewensteins' lot, and divided that three-acre lot into parcel 1 and parcel 2. Parcel 1, containing the Loewensteins' home, would have been reduced to 1.07 acres and parcel 2, the former back portion of the lot, now including the tank parcel, would have been 2.12 acres.

Stone hand-carried the application to Michael Henn and waited for him to sign off on it. Instead, a series of communications ensued explaining why the application was not being processed. Henn deferred to City Attorney Charles Williams, who was reviewing the application. While Stone characterized the process as merely expanding the smaller tank parcel into a larger conforming lot, the City viewed the application as a splitting of the Loewensteins' existing lot within the subdivision. Stone later testified that neither the planning commission nor the city council gave her any advance assurances that a lot line adjustment application would be approved.

Ultimately, the City denied the lot line adjustment application, and the Loewensteins then appealed that decision to the Lafayette City Planning Commission (commission). The commission denied the appeal, stating that the proposed action would place a fifth lot and house in a subdivision that was restricted to four lots. The commission also made a finding that the proposed adjustment would not be consistent with local zoning because it would reduce the lot area of the proposed new parcels to 1.07 and 2.12 acres, which did not conform to the minimum lot area requirements of the municipal code, based on the average slope of lots defined as hillside land. In the commission's opinion, the lot line revision proposal was a circumvention of the normal subdivision requirements.

The commission's decision was appealed to the city council. On May 11, 1998, that body issued a resolution denying the adjustment. Additional hearings were held before the city council on June 22, 1998, July 27, 1998, and August 10, 1998. Peter Loewenstein explored filing a subdivision application after the city council issued its May 11 resolution, but determined that he did not want to risk a denial of such an application, in light of the time and expense involved. Loewenstein asked the city council to amend the former resolution to make the denial effective immediately so that a court challenge could be instituted. On August 10, 1998, the city council complied, and issued a second denial in resolution No. 69-98, that superceded the original denial.

Resolution No. 69-98 recited the underlying facts of the lot line adjustment application and determined that a fifth lot could not be authorized in the subdivision without compliance with the City's subdivision regulations and the SMA. The resolution stated that approving the Loewensteins' application would have the effect of creating a new lot, and of creating a fifth lot

in the restricted subdivision. It acknowledged the Loewensteins' view that they were not creating a fifth lot because they were adding approximately two acres of their lot to the tank parcel, which was outside the subdivision. The resolution determined that the building site for the proposed residence would be on the split-off portion of the original lot, rather than on the tank parcel, resulting in a fifth lot serviced by infrastructure and improvements constructed for the original four-lot subdivision. A specific building site was not a part of the application. The resolution concluded that the Loewensteins' proposal deprived the City of its authority over subdivisions and allowed the Loewensteins to avoid the mandatory and discretionary requirements that are a part of the subdivision process.

On September 24, 1998, the Loewensteins filed a complaint in superior court seeking administrative mandamus, ordinary mandamus, declaratory relief and damages for inverse condemnation under the takings clause of the Fifth Amendment of the United States Constitution.

The parties submitted the case to Superior Court Judge Richard L. Patsey, based on the administrative record, oral argument and documents evidencing the legislative history of the lot line adjustment exception to the SMA. (§ 66412, subd. (d).) On March 9, 1999, Judge Patsey filed an order granting the petition for writ of mandate, stating "granting the lot line adjustment would not violate any zoning, building or slope density ordinances or regulations of [r]espondent City of Lafayette. Thus, whether the standard of review be substantial evidence or arbitrariness, [r]espondent City of Lafayette's denial has no support in the administrative record." Judge Patsey rejected the City's argument that the section 66412, subdivision (d) exception for lot line adjustments was not applicable, stating that there was no restriction in the Government Code against creating a greater number of parcels within a subdivision, but only against creating a greater number of parcels than previously existed.

The Loewensteins filed a memorandum of costs that claimed attorney fees under section 800, providing for fees when the "determination of the proceeding was the result of arbitrary or capricious action or conduct by a public entity or an officer thereof in his or her official capacity, . . ." The court granted the City's motion to tax costs, stating that denial of the lot line adjustment application was not arbitrary and capricious within the meaning of section 800.

At the April 1999 hearing on the motion to tax costs, Judge Patsey characterized the case as "a very close and . . . difficult case" and acknowledged that the legislative history supported the City's argument and that the

City's contention that it should be able to control development "made a good deal of sense." The court continued: "This was no minor lot line adjustment by any stretch of the imagination in my view and, therefore, I had to wrestle with the question whether or not the result of burdening a subdivision with five homes by this lot line adjustment, where it was originally designed to accommodate four homes, was appropriate and lawful." The court concluded: "[B]y no stretch of the imagination can I say, given the wrestling I did with this issue, that the City's position was arbitrary or capricious." On November 3, 1999, the court issued its writ of mandate ordering the City to set aside its denial of the application and reconsider its action in light of the court's decision.

In August of 1999, the parties submitted issue conference statements on the takings issue. The Loewensteins argued that denial of the lot line adjustment application constituted a taking of their property without just compensation. The City argued the legal issues of ripeness and that its action was not a taking under *Landgate, supra,* 17 Cal.4th 1006.

On January 27, 2000, Judge Patsey issued an order rejecting the City's ripeness argument, stating that it would be futile for the Loewensteins to proceed with an application under the SMA and that there was no possibility that the landlocked tank parcel could be developed independent of the residential parcel.

On April 24, 2000, Judge Maria Rivera, to whom the case had been reassigned, issued an order regarding the City's argument that *Landgate* precluded a finding of inverse condemnation as a matter of law. That order consisted of two findings. The first finding was that: "[t]he court cannot find on the record presented that the City's action was so objectively unreasonable that it was made for no other reason than to delay the proposed project. To the contrary the City's decision, though erroneous, was rational and, as stated by Judge Patsy [*sic*], not arbitrary or capricious. Nor can a delay of a little over two years for processing the application, the administrative appeals and this litigation be considered an unreasonable delay that results in a taking." Despite the finding that the regulatory delay alone did not amount to a taking, the court without elaboration found there were disputed issues of fact and referred the issue for trial of what the order characterized as "the remaining theory for taking" under *Penn Central Transp. Co. v. New York City* (1978) 438 U.S. 104 [98 S.Ct. 2646, 57 L.Ed.2d 631] (*Penn Central*) and *Kavanau v. Santa Monica Rent Control Bd.* (1997) 16 Cal.4th 761 [66 Cal.Rptr.2d 672, 941 P.2d 851] (*Kavanau*). Judge Rivera subsequently recused herself and the matter was assigned to Judge William M. Kolin for trial.

The trial court bifurcated the issues of liability for a taking and the appropriate amount of just compensation. At the trial, the testimony focused on the nature of the City's objections to the application and the potential uses of the tank parcel.

Planning services manager Michael Henn testified that the conditions of approval of the Loewensteins' subdivision restricted it to four lots. The restriction was supposed to be formalized though the recordation of a scenic easement deed. He did not believe the scenic easement deed had ever been recorded.[5] He stated if the tank site had road and utility access, a two-story, 3,150-square-foot residence could be constructed on the site. In Henn's opinion, if a lot line application had been filed merely seeking to transfer the triangular portion of the Miller property to the Loewensteins and provide access to the tank parcel, it would not be considered a subdivision and would have been routinely granted.

On July 3, 2000, Judge Kolin issued a decision following the trial. The court reviewed the case law on inverse condemnation, noting that a regulation that deprives a property owner of all economically beneficial use of the land effects a taking requiring just compensation. Although the court noted *Landgate,* it stated that the case was similar to *San Dieguito Partnership v. City of San Diego* (1992) 7 Cal.App.4th 748 [9 Cal.Rptr.2d 440] (*San Dieguito*), and determined that the City had used an improper standard in evaluating the lot line adjustment application. Based on Judge Patsey's findings and the testimony and documents presented at trial, the court determined that the impact of the City's action was to deny the Loewensteins "substantially all economically viable use of their property." The court found, on the evidence presented: that the Loewensteins could not develop the landlocked tank parcel without the City's approval of the application; that the property was without market value because it was purchased only with a view towards the lot line adjustment; that the City's regulatory action was unrelated to any substantial public purpose; and that Henn's testimony regarding the rejection of the Loewensteins' application was not credible in light of the evidence that in 16 years, over 200 lot line adjustments had been approved.

The court listed three specific findings in its decision: (1) the Loewensteins purchased the tank parcel with reasonable investment-backed expectations that it could be rendered a buildable lot through the lot line adjustment process; (2) the economic impact of the City's regulation denied all

---

[5]City planner Elizabeth Van Popering testified that in addition to the restriction in the subdivision conditions, the conditions of a variance that the Loewensteins had obtained when they built their home included the four-lot limitation.

economically viable use of the property; and (3) the City's regulatory action failed to advance any legitimate state interest and involved the application of an arbitrary standard in direct conflict with the plain language of section 66412, subdivision (d) and *San Dieguito*. The court awarded $611,666.66 in just compensation for the loss of use of the proposed new parcel as merged with the tank parcel. The court also awarded costs and attorney fees to the Loewensteins.

A corrected judgment incorporating the issuance of the writ of mandate and findings on liability and just compensation was filed on October 2, 2000. The City moved for a new trial, which was denied by operation of law.[6] The City filed a notice of appeal from the judgment. The Loewensteins filed a cross-appeal from portions of Judge Patsey's order denying attorney fees under section 800.

On November 13 and 27, 2000, the City rescinded its denial of the request for a lot line adjustment and withdrew its legal position on which the denial was based, thereby rendering the taking temporary. (*First Lutheran Church v. Los Angeles County* (1987) 482 U.S. 304, 321 [107 S.Ct. 2378, 2389, 96 L.Ed.2d 250] (*First Lutheran*) [after taking occurs government retains option to withdraw invalidated regulation].) On May 1, 2001 the City granted the resubmitted lot line adjustment application.[7]

## DISCUSSION

▮    The Constitution prohibits the government from taking private property for public use without just compensation. (U.S. Const., 5th & 14th Amends.; Cal. Const., art. I, § 19.) But the prohibition has limits that allow the government to fulfill its purpose without paying for every exercise of the police power. As stated by Justice Holmes in *Penna. Coal Co. v. Mahon* (1922) 260 U.S. 393 [43 S.Ct. 158, 67 L.Ed. 322, 28 A.L.R. 1321], "[g]overnment hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law." (260 U.S. at p. 413 [43 S.Ct. at p. 159].) "The general rule at least is,

---

[6]The court filed an order purporting to reopen the case to determine whether the City's withdrawal of its rejection of the lot line adjustment application affected the amount of damages. The order was filed beyond the statutory time period in which the court could have ruled on the new trial motion and the motion was therefore denied by operation of law. (Code Civ. Proc., § 660 [time for ruling on new trial motion is 60 days after notice of entry of judgment].)

[7]The City's unopposed request for judicial notice of its formal withdrawal of the denial of the request for a lot line adjustment and its May 1, 2001 letter granting the resubmitted lot line adjustment is granted. (*San Mateo County Coastal Landowners' Assn. v. County of San Mateo* (1995) 38 Cal.App.4th 523, 552-553 [45 Cal.Rptr.2d 117] [court took judicial notice of legal opinion letter from county as official act of legislative department of any state].)

that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." (260 U.S. at p. 415 [43 S.Ct. at p. 160].)

When government regulation denies an owner all economically beneficial use of the land, a taking is established and compensation is due. (*Lucas v. South Carolina Coastal Council* (1992) 505 U.S. 1003, 1015 [112 S.Ct. 2886, 2893, 120 L.Ed.2d 798].) When the regulation deprives the owner of something short of all economically beneficial use, courts consider the factors identified in *Penn Central, supra*, 438 U.S. 104. Those factors include "[t]he economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations . . . [and] the character of the governmental action. A 'taking' may more readily be found when the interference with property can be characterized as a physical invasion by government, [citation], than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." (*Penn Central, supra*, 438 U.S. at p. 124 [98 S.Ct. at p. 2659].)

A recent case reconfirmed that the analysis described in *Penn Central, supra*, 438 U.S. 104, is still the appropriate method of determining whether a taking has occurred, in the absence of the categorical takings represented by actual occupation of the land or where regulation deprives the landowner of all economically viable use of the land. (*Tahoe-Sierra P. Council v. Tahoe RPA* (2002) 535 U.S. 302 [122 S.Ct. 1465, 152 L.Ed.2d 517].)

In *First Lutheran, supra*, 482 U.S. 304, the United States Supreme Court addressed the appropriate remedy when government regulation in fact causes a temporary deprivation of all economically viable use of private property. Although the *First Lutheran* case determined that compensation was appropriate for a temporary taking, it did not address the issue of whether the regulatory activity in that case actually resulted in a taking. The court stated that it was not addressing "the quite different questions that would arise in the case of normal delays in obtaining building permits, changes in zoning ordinances, variances, and the like which are not before us." (*Id.* at p. 321 [107 S.Ct. at p. 2389].)

Some of the most difficult questions in "taking" jurisprudence arise from the issues implicated when a temporary taking is caused by government regulation and land use decisionmaking. (See, e.g., Lycett, *Landgate, Inc. v. California Coastal Commission: Why Temporary Takings Law is "Screwed Up."* (2000) 7 Hastings W.-N.W. J. Envtl. L. & Pol'y 55.) However, our Supreme Court has directly addressed the subject of temporary taking caused

by delays in issuing land use permits. (*Landgate, supra,* 17 Cal.4th 1006.) The *Landgate* court unequivocally rejected the argument that a temporary loss of all use of property caused by the erroneous denial of a development permit necessarily results in a compensable taking. But the *Landgate* court also noted that a different case would be presented if a delay in issuing a permit "was so unreasonable from a legal standpoint" as to support the conclusion that the government agency was only delaying the development project. (*Landgate, supra,* 17 Cal.4th at p. 1024.)

█ In support of the trial court's decision in this case, the Loewensteins try to fit this case into the exception for legally unreasonable acts mentioned in *Landgate.* They rely primarily on two cases, *San Dieguito, supra,* 7 Cal.App.4th 748 and *Ali v. City of Los Angeles* (1999) 77 Cal.App.4th 246 [91 Cal.Rptr.2d 458] (*Ali*), to argue that the City's legal position was objectively unreasonable, which precludes reliance on *Landgate.*

Alternatively, the Loewensteins contend that even if the City's actions did advance a legitimate interest, denial of the application interfered with their reasonable investment-backed expectations, caused a direct economic impact on them, and thus failed the *Penn Central* analysis.[8] We disagree with both contentions for the following reasons.

*The Case Is Governed by the Holding in Landgate*

We agree with Judge Rivera's ruling that the City's action was not objectively unreasonable because it was not taken solely to delay the proposed project. As further developed by the testimony at trial, even assuming the City's decision was erroneous, it was rational and not arbitrary or capricious.[9] In light of the facts developed in this case, the delay of a little over two years to resolve the threshold issue of the availability of the lot line adjustment exception to the SMA was not an unreasonable regulatory delay. *Landgate* mandates these conclusions as we now explain.

The issue analyzed in *Landgate* was stated by Justice Mosk as: "whether a delay in the issuance of a development permit partly owing to the mistaken

---

[8]Because we find there was no taking as a matter of law, we do not consider the amount of compensation due. However, we note that there was no evidence that the City restricted the Loewensteins' ability to sell the tank parcel, to enter it or to exclude others from it. Peter Loewenstein candidly admitted that if there was road and utility access, it was possible to develop the tank parcel independently. Furthermore, Loewenstein testified that although he believed the best building site was on the tank parcel itself, he never submitted an application for a particular building site or access for the proposed new parcel, or talked with anyone at the City about a specific building site.

[9]Because the City complied with the writ of mandate, the issue of the correctness of the City's action is not before us.

assertion of jurisdiction by a government agency is a type of 'temporary taking' contemplated in *First Lutheran*, or if it is more in the nature of a 'normal delay' that does not constitute a taking." (*Landgate, supra,* 17 Cal.4th at p. 1010.) The plaintiff in *Landgate* bought a sloped lot in the Malibu Hills, subject to the jurisdiction of the California Coastal Commission (Coastal Commission) that along with a second lot, had been reconfigured by the prior owners with the consent of the county. (*Idid.*)

When Landgate received county approval for grading and building a large home on its property, the Coastal Commission, based on staff recommendations and a memorandum from the Attorney General, continued the matter to consider the threshold issue of whether the earlier lot line adjustment was legal. (*Landgate, supra,* 17 Cal.4th at pp. 1011-1013.) When the Coastal Commission ultimately denied the application, Landgate filed a petition for writ of mandate and a complaint alleging a taking without just compensation. (*Id.* at p. 1013.)

The trial court granted Landgate's petition and set aside the Coastal Commission's denial, stating that the lot line adjustment was not subject to the Coastal Commission's jurisdiction. The Court of Appeal upheld the trial court's decision, stating that the Coastal Commission's position regarding the lot line adjustment would render the property valueless. After the writ of mandate issued, a modified application was approved with conditions. (*Landgate, supra,* 17 Cal.4th at pp. 1014-1015.)

Landgate then moved for summary adjudication on its takings claim, arguing that the erroneous assertion of jurisdiction to determine the legality of the lot line adjustment prevented all economically viable use of the property. Although the trial court granted Landgate's motion and the Court of Appeal affirmed, the Supreme Court reversed. The Supreme Court summarized applicable takings jurisprudence, culminating with the *First Lutheran* case. The court noted that *First Lutheran* did not address "normal delays in obtaining building permits, changes in zoning ordinances, variances, and the like . . . ." (*Landgate, supra,* 17 Cal.4th at pp. 1015, 1017, 1032.) "Virtually every court that has examined the issue has concluded . . . that a regulatory mistake resulting in a delay does *not,* by itself, amount to a taking of property. [Citations.]" (*Id.* at pp. 1018-1019.) The *Landgate* court agreed with the many other courts concluding that "an error by a governmental agency in the development approval process does not necessarily amount to a taking even if the error in some way diminishes the value of the subject property, . . ." (*Id.* at p. 1020.)

The court acknowledged that if the government's error is "of a particular constitutional type—the passage and enforcement of a law or regulation that

deprives property of all value—then the teaching of *First* [*Lutheran*] is that such an error is a compensable taking. But government land use regulations and decisions . . . which, despite their ultimately determined statutory defects, are part of a reasonable regulatory process designed to advance legitimate government interests, are not takings of property . . . ." (*Landgate, supra,* 17 Cal.4th at p. 1021.)

Applying the *Landgate* analysis to this case, there is no substantial evidence to support the conclusion that the City's action was taken for any motive other than carrying out a substantial government interest. At oral argument of this appeal, the Loewensteins argued that the trial court based its decision in part on its determination that Henn's testimony was not "persuasive or entirely credible" and that 200 other lot line applications had been granted in the past. According to respondents, we are bound by the trial court's findings of fact. The legitimacy of a city's interest in land use planning, as expressed in the applicable resolution in this case, does not rest on the testimony of Henn. Henn, who was only the planning services manager, could not have testified as to the intent or legitimacy of an action by the council.

The trial court's finding regarding the credibility of one individual, even if accepted, has little bearing on the ultimate issue of the local government's motive. Resolution of that question is an objective determination, drawn not from an inquiry into individual motives, but from an analysis of the evidence supporting the government agency's official findings. "The proper inquiry is not into the subjective motive of the government agency, but whether there is, objectively, sufficient connection between the land use regulation in question and a legitimate governmental purpose so that the former may be said to substantially advance the latter." (*Landgate, supra,* 17 Cal.4th at p. 1022.)

Peter Loewenstein presented evidence of other lot line adjustments that were approved by the City to the council. He testified at the trial that he reviewed a number of applications and selected the best four or five that he felt would demonstrate why his application should be granted. When asked on cross-examination if any of the applications concerned a restriction on further subdivision, Loewenstein answered that he thought, but was not certain, that one of the applications may have involved such a restriction. When confronted with the specific application, he conceded that he had not stated there was a similar restriction in his presentation to the City. He also conceded that he had not checked on the particular restrictions in that application.

Even if Loewenstein had presented evidence that the City made exceptions to a similar subdivision restriction in other applications, the existence

of exceptions to a valid policy regarding development would not negate the City's showing that the policy was legitimate in this case. Our Supreme Court flatly rejected a similar argument in *Landgate,* stating: "The fact that there may have been exceptions to this policy, based on considerations particular to these specific projects, for reasons not present in the current administrative record and about which we can only speculate, does not negate the fact that the [Coastal] Commission had a rational policy preference for concentrating development on the south side of De Butts Terrace." (*Landgate, supra,* 17 Cal.4th at p. 1024.) The evidence that other lot line applications were granted is not substantial evidence in support of the trial court's finding that the City was not pursuing a legitimate governmental interest.

The City's reasons for rejecting the lot line revision application, as expressed in the official resolution, were based on concerns that the reduced area of the new parcels would not conform to the minimum lot size requirements for hillside lots, and that the application created a fifth lot in a duly restricted subdivision with improvements and utilities designed for four lots. Even if the City incorrectly maintained that lot size and subdivision restrictions applied, the monitoring of density and hillside slope requirements are legitimate governmental interests. (See, e.g., *Northwood Homes, Inc. v. Town of Moraga* (1989) 216 Cal.App.3d 1197, 1202 [265 Cal.Rptr. 363] [local ordinance placing stringent restrictions on hillside development upheld as reasonably related to the regional welfare]; *Del Mar v. California Coastal Com.* (1984) 152 Cal.App.3d 49, 52 [199 Cal.Rptr. 225] [slope and density considerations supported commission's decision to deny permit].) Hillside properties require particular oversight. The 1977 City-imposed land use restriction prohibiting further subdivision was a legitimate exercise of governmental policy and regulatory authority.

Unlike the summary lot line adjustment procedure, the SMA provides opportunities for neighborhood input on the effects of development and detailed study of all impacts on the community. (See, e.g., *Horn v. County of Ventura* (1979) 24 Cal.3d 605, 616 [156 Cal.Rptr. 718, 596 P.2d 1134] [neighbors entitled to notice and opportunity to be heard before the approval occurs]; *Cohan v. City of Thousand Oaks* (1994) 30 Cal.App.4th 547, 555 [35 Cal.Rptr.2d 782] [SMA gives opportunity to other property owners to be heard where subdivision plan impacts topography, density, public health, access rights, or community land use plans].) Protecting the rights of its residents to be heard on community land use is also a valid governmental purpose. Although the record does not demonstrate any opposition of immediate neighbors to the lot line adjustment proposal, a formal subdivision process with notice to affected landowners affords broader community comment.

When *Landgate* applies, the *Penn Central* factors will, of necessity, be absent. The normal delay in approving the application cannot be said to have " 'prohibited a beneficial use to which [the property] had previously been devoted' [citation], thus interfering with [the Loewensteins'] 'primary expectation' [citation]." (*Kavanau, supra,* 16 Cal.4th at p. 780.) The delay here did not abrogate the total use of the property, as did the government action in *Penn Central, supra,* 438 U.S. at pp. 127-128 [98 S.Ct. at pp. 2660-2661].) There was no physical invasion, no extinguishing of a fundamental attribute of ownership, or loss of all beneficial use of the tank parcel. (*Kavanau, supra,* 16 Cal.4th at pp. 780-781.)

The Loewensteins were not prevented from building a residence on the tank parcel if they could supply access and were not prevented from supplying an access. Henn testified that under existing setback and frontage requirements, a 1,575-square-foot single-story and a 3,150-square-foot two-story house could be constructed on the tank lot. The only delay was in obtaining permission to use a summary procedure to change the use of the acquired parcel, to enlarge it and divide the existing parcel. "[T]he submission that appellants may establish a 'taking' simply by showing that they have been denied the ability to exploit a property interest that they heretofore had believed was available for development is quite simply untenable." (*Penn Central, supra,* 438 U.S. at p. 130 [98 S.Ct. at p. 2662] [rejecting argument that taking of air space rights occurred].)

The delay in the Loewensteins' development plans caused by the need for resolution of this threshold issue, and the court's subsequent determination that the City was mistaken, does not convert the pursuit of a reasonable policy into an unconstitutional taking. (See also *Littoral Development Co. v. San Francisco Bay Conservation etc. Com.* (1995) 33 Cal.App.4th 211, 221 [39 Cal.Rptr.2d 266] [no unconstitutional regulatory taking where property was only subject to delay caused by uncertainty as to regulatory jurisdiction].) Landgate, Inc., similarly contended that from the time the development plan was denied in February 1991 until the time it was approved in February 1993 after the lot line issue had been resolved by litigation, the development process was at a standstill, effectively depriving the property of all economic benefit. (*Landgate, supra,* 17 Cal.4th at pp. 1013, 1015.) But *Landgate* explains that a judicial determination of the validity of certain preconditions to development is a normal part of the development process.[10]

---

[10]Numerous examples are set forth in *Landgate, supra,* 17 Cal.4th at pages 1030-1031. Compare Comment, *The Abnormalcy of Normal Delay* (2001) 28 Pepp. L.Rev. 415, 428-429.

(*Landgate, supra,* at p. 1030.) Such a temporary bottleneck in the process is not a taking of property.[11]

*The Exception Noted in Landgate Does Not Apply*

The *Landgate* court noted an exception to its holding that normal delay in obtaining permits is not a taking, even though the government's position substantially advances a legitimate state interest, if the "position was so unreasonable from a legal standpoint as to lead to the conclusion that it was taken for no purpose other than to delay the development project before it." In such a case, the court stated that this kind of "delaying tactic" could not be said to advance any valid government purpose. (*Landgate, supra,* 17 Cal.4th at p. 1024.)

The Loewensteins contend that *San Dieguito, supra,* 7 Cal.App.4th 748 and *Ali, supra,* 77 Cal.App.4th 246 decided the precise question at issue here adversely to the City and made the City's insistence on blocking the lot line adjustment objectively unreasonable and without legal support. Both of the cited cases are transparently distinguishable and do not purport to decide the issue facing the City in this case.

In *San Dieguito*, a developer applied for a lot line adjustment to reconfigure nine existing parcels in a 189-acre area. (*San Dieguito, supra,* 7 Cal.App.4th at p. 751.) The application was rejected based on a city attorney's opinion that it created more than five new lots and was, therefore, subject to the SMA. (*Id.,* at pp. 753-754.) The owner filed an action seeking to compel the city to process a lot line adjustment under the exception in section 66412, subdivision (d). The trial court agreed with the city that the lot line adjustment exception to the SMA was intended to permit only minor changes in parcel lines and implied that only two parcels could be the subject of an adjustment. The Court of Appeal in *San Dieguito* rejected the trial court's reasoning, stating that the language of subdivision (d) was clear, and it did not refer to minor changes or limit the number of parcels.[12] (*San Dieguito, supra,* 7 Cal.App.4th at pp. 756-759.)

Ali, *supra,* 77 Cal.App.4th 246 does not address the issue facing the City in this case. In *Ali,* the city's action of denying a demolition permit for a

---

[11]For example, a temporary delay in receiving the benefits of property ownership, such as a delay in receiving increased rental income due to an imposed rent increase limit, does not constitute a taking of property. (*Kavanau, supra,* 16 Cal.4th at p. 780.)

[12]In 2001, the Legislature changed the application of the SMA exception to limit it to: "a lot line adjustment between four or fewer existing adjoining parcels, . . ." (§ 66412, subd. (d).)

hotel that was substantially destroyed in a fire, based on a local ordinance prohibiting demolition of such housing violated the Ellis Act. (§ 7060, subd. (a).) The court distinguished *Landgate*, based on that court's discussion of whether the actions of the regulating government entity advance a legitimate government purpose. The *Ali* court held that the city's action violating state law was arbitrary and unreasonable in light of the earlier case of *Javidzad v. City of Santa Monica* (1988) 204 Cal.App.3d 524 [251 Cal.Rptr. 350], that held a city ordinance governing rental property was preempted by the Ellis Act. (*Ali, supra,* 77 Cal.App.4th at p. 255.)

The Loewensteins argue that like the cities in *San Dieguito* and *Ali*, the City here has taken an objectively unreasonable and legally unsupportable position that leads to the conclusion that it was seeking only to delay development. They contend that the City should have known it could not reject the application on the ground it violated municipal hillside ordinances or created new parcels in a restricted subdivision because *San Dieguito* decided this precise issue. Without commenting on the rationale of *San Dieguito* and *Ali* and because they are distinguishable, we reject the notion that they apply here for the following reasons.[13]

Unlike the city in *San Dieguito*, the City here did not deny the application because it was inferring limitations on the number of lots subject to the lot line exception or because it assumed that only minor changes could be processed under the exception. It rejected the application because it believed the adjustment would create an extra lot in a restricted subdivision and because of concerns that it would violate municipal ordinances regarding hillside property. The exception in section 66412, subdivision (d) expressly recognizes that a city may consider whether the proposed lot line adjustment will violate local land use ordinances. The exception states: "A local agency . . . shall limit its review and approval to a determination of whether or not the parcels resulting from the lot line adjustment will conform to the local zoning and building ordinances." Unlike the City of San Dieguito, the City of Lafayette attempted to do no more than what the statute allows—ensure conformance with local zoning and building restrictions.

Moreover, relying on the independent advice of the city attorney, the City rejected the proposal for reasonable land use purposes. City resolution No. 69-98, in the record, sets forth legitimate reasons that advance governmental interests for denying the lot line adjustment application.

---

[13]The reasoning of *Ali* has been criticized. (Alperin, *The "Takings" Clause: When Does Regulation "Go Too Far"?* (2002) 31 Sw.U. L.Rev. 169, 221-225.)

The City's view of the Loewensteins' application is rational and closely related to the planning goals of local zoning and building ordinances. The result of the Loewensteins' proposed lot line adjustment would have split the three-acre parcel with the aim of building a fifth house on the parcel in the restricted hillside subdivision. By purchasing the small tank parcel, and folding it into this plan, they could argue that they met the letter of the lot line exception, in that they owned two lots before, and two lots after the adjustment. The Loewensteins' proposal was a creative concept, worthy of the City's consideration. To avoid the City's concerns about building a fifth home, the Loewensteins argued they were not merging the tank parcel into the subdivision lot, but were pulling a section of the original lot out of the subdivision and placing it into the tank parcel. These fine distinctions, although accepted by the trial court's ruling that the City's view was wrong, do not make the City's valid concerns either legally unreasonable or logically deficient. Judge Patsey's decision did not transform an honest difference of opinion into a compensable taking.

Neither *San Dieguito* nor *Ali* supplies the applicable legal rule for the unusual lot line adjustment proposed by the Loewensteins. The City here did not violate a state law and did not claim to read limitations into the SMA, but sought only to make certain that the application complied with local land use regulations. This case fits like a hand in a glove with the rule established by *Landgate*. Resolution of the threshold issue of the legality of the lot line adjustment was a normal delay in the process of obtaining a permit pertaining to land use. (*Landgate, supra,* 17 Cal.4th at pp. 1017-1018.)

*The Penn Central Factors Are Negated by the Landgate Analysis*

The Loewensteins argue that even if the City was pursuing a valid governmental interest, its delay in processing the lot line adjustment application interfered with their reasonable investment-backed expectations and therefore failed the *Penn Central* analysis. (*Kavanau, supra,* 16 Cal.4th at p. 775 [rent control regulation that does not deprive owner of all economic use is evaluated by *Penn Central* factors].) As noted above, the *Penn Central* factors include consideration of the economic impact of the regulation, the character of the government's action and the extent of interference with "distinct investment-backed expectations." (*Penn Central, supra,* 438 U.S. at p. 124 [98 S.Ct. at p. 2659].)

However, the *Penn Central* factors are resolved by the analysis in *Landgate.* Once a court determines that a governmental entity engaged in decisionmaking whose purpose is not delay for delay's sake but legitimate

oversight, the question of whether a landowner has a reasonable investment-backed expectation that is impacted in a manner requiring compensation is, of necessity, answered in the negative. A landowner can have no reasonable expectation that there will be no delays or bona fide differences of opinion in the application process for development permits. Sometimes the application process must detour to the court process to resolve a genuine disagreement. Because such delay comes within the *Landgate* category of normal delays in the development approval process, there is no taking even if the value of the subject property is diminished in some way. (*Landgate, supra,* 17 Cal.4th at p. 1020.)

Similarly, a normal delay in the approval process does not prohibit a use to which the property was previously devoted, or result in acquisition of resources for a public purpose, but is inherent in the legitimate exercise of a city's duty to monitor land use planning. (*Kavanau, supra,* 16 Cal.4th at pp. 780-782.) The temporary economic impact on a landowner caused by a *Landgate* delay is considered a normal incident of property ownership, and as such, does not figure in the weighing process against the government in a *Penn Central* analysis. In short, the analysis stops when *Landgate* forecloses it.

*The Cross-appeal*

The Loewensteins cross-appeal from Judge Patsey's order denying attorney fees for the mandamus portion of the case under section 800. This contention is based on the argument that the City's actions were arbitrary and capricious. The trial court found otherwise and we agree.

Section 800 provides for attorney fees: "where it is shown that the award, finding, or other determination of the proceeding was the result of arbitrary or capricious action or conduct by a public entity or an officer thereof in his or her official capacity, . . ." Judge Patsey made explicit comments to the effect that the City's position had some support in the legislative history, and opined that the Loewensteins' application was not a routine lot line adjustment and that it presented "a very close and . . . difficult case." We agree that the City's position regarding the application "made a good deal of sense." The Loewensteins failed to show that this case involved arbitrary or capricious agency action.

## DISPOSITION

The judgment on the takings claim is reversed.[14] The case is remanded with directions to enter a new judgment in favor of the City. The order regarding attorney fees is affirmed. Appellant is entitled to costs.

Swager, J., and Margulies, J., concurred.

A petition for a rehearing was denied December 10, 2002, and the petition of plaintiffs and appellants for review by the Supreme Court was denied February 11, 2003. Chin, J., and Brown, J., were of the opinion that the petition should be granted.

---

[14]In light of our determination that *Landgate* is the linchpin in this case, there is no need to decide appellant's argument that Judge Patsey erred in determining "ripeness."