[No. E045541. Fourth Dist., Div. Two. May 18, 2009.]

HEALTH FIRST, Plaintiff and Respondent, v.
MARCH JOINT POWERS AUTHORITY, Defendant and Appellant;
TESCO STORES WEST, INC., Real Party in Interest and Appellant.

Counsel

Best Best & Krieger, Michelle Ouellette and Charity B. Schiller for Defendant and Appellant.

Brownstein Hyatt Farber Schreck, Lisabeth D. Rothman, Diane C. DeFelice and Timothy H. Irons for Real Party in Interest and Appellant.

Johnson & Sedlack, Raymond W. Johnson, Abigail A. Broedling and Veera Tyagi for Plaintiff and Respondent.

Opinion

GAUT, J.—

## 1. Introduction[1]

This CEQA[2] case involves the development by the March Joint Powers Authority (the Authority) with Tesco Stores West, Inc. (Tesco), the British grocer, of a large warehouse distribution facility located on former March Air Force Base.

Since the mid-1990's, the Authority has been developing and implementing a reuse plan for the former military base. Tesco submitted a design plan application (Plot Plan 06-03) to the Authority in May and June 2006. The Authority approved the application in September 2006. Construction was completed and the facility became operational early in 2008. The distribution facility serves Tesco's Fresh & Easy Neighborhood Markets in several states.

In October 2006, Health First, a citizens' group, filed a petition for writ of mandate challenging the approval of Tesco's design plan application on CEQA grounds. In April 2008, the court entered judgment granting the writ petition on the grounds that approval of the application was discretionary, not ministerial. The Authority and Tesco, the real party in interest, appeal.

[1] We deny the requests for judicial notice filed on July 23 and October 22, 2008. Consideration of the matters addressed in those notices either was not part of the administrative record or is unnecessary to the resolution of the appeal, or both. (Evid. Code, §§ 452, subd. (c), 459; Code Civ. Proc., § 909; *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 573, fn. 4 [38 Cal.Rptr.2d 139, 888 P.2d 1268]; *In re Zeth S.* (2003) 31 Cal.4th 396, 405 [2 Cal.Rptr.3d 683, 73 P.3d 541]; *RiverWatch v. Olivenhain Municipal Water Dist.* (2009) 170 Cal.App.4th 1186 [88 Cal.Rptr.3d 625].)

[2] California Environmental Quality Act, Public Resources Code section 21000 et seq. All statutory references are to the Public Resources Code unless stated otherwise.

Tesco and the Authority argue that approval of the design plan application was a ministerial act, not a discretionary act, and was exempt from environmental review under CEQA. We agree and we reverse the judgment.

## 2. Factual and Procedural Background

### a. The Master Reuse Plan and the Redevelopment Plan

In 1996, as part of the master reuse plan, the United States Air Force prepared a final environmental impact statement for disposal of portions of March Air Force Base. Also in 1996, the Authority prepared a separate redevelopment plan, including a final environmental impact report (Final EIR). No public comment by private citizens was made to the redevelopment environmental impact report.

### b. The General Plan

The first CEQA review of the proposed development for the March property was the general plan completed in 1999. The general plan included a master environmental impact report (Master EIR), as is appropriate for a plan to reuse a federal military base. (§ 21157, subd. (a)(8).) The general plan addressed the reuse of 4,400 acres of the original 6,500-acre base. It considered various land uses, including a business park and industrial uses. The build-out for industrial use was estimated to be 433 acres and 1,980,455 square feet. The general plan anticipated using subsequent specific plans and a design review process for flexibility in development. The general plan and the Master EIR made detailed evaluations of transportation, noise, and air quality impacts. No public comment or testimony was received regarding the draft Master EIR. The final Master EIR provided: "future development and programs to implement the General Plan will be subject to discretionary approval by the March JPA [the Authority], including review for conformity with the General Plan, and incorporation of mitigation measures adopted in certifying the Final EIR with the General Plan." In September 1999, pursuant to CEQA, the Authority adopted a resolution in which it certified the final Master EIR, adopted environmental findings, adopted a statement of overriding consideration, and adopted a mitigation and monitoring program.

c. The Specific Plan

Based on the general plan, in 2003, the Authority adopted as a discretionary project, the specific plan for the March Business Center. Again, there was CEQA review, this time using the final focused EIR and a mitigation monitoring and reporting plan. The final focused EIR incorporated public comment, both written and by testimony, with appropriate responses.[3]

The specific plan established "guidelines for a future development accommodating Business Park, Industrial, Office, Mixed Use, Commercial and Open Space land uses. The objective of the Specific Plan is to guide and regulate the development of the March Business Center in accordance with the March JPA General Plan."

The focused EIR "prepared in accordance with the provisions of CEQA . . . evaluates the land use plan, circulation and infrastructure improvements associated with the March Business Center Specific Plan and the potential impacts that would result from their implementation. *The EIR is intended to serve as the project-wide environmental document for the March Business Center Specific Plan.* . . . [A]ny project which deviates or has impacts not considered in the Focused EIR shall require additional environmental documentation. Together, the March Business Center Specific Plan, Tentative Map and EIR provide a path to properly develop the project site, taking into account policies, goals, objectives and environmental considerations of the March JPA General Plan." (Italics added.) The final focused EIR noted, the great majority of environmental impacts associated with the project were analyzed in the general plan's Master EIR.

The specific plan's project-level analysis (Cal. Code Regs., tit. 14, § 15161 (Guidelines)) evaluated anticipated land uses and intensities, traffic, air quality, and other environmental impacts for a full build-out of 370 acres of the March Business Center. The specific plan reduced the traffic that had been previously approved under the general plan. The general plan had analyzed 131,400 anticipated daily trips and the specific plan analyzed only 88,100 anticipated daily trips. After mitigation, only air quality impacts remained significant and a statement of overriding considerations was adopted for those impacts.

---

[3] The specific plan was challenged by a lawsuit that was settled.

### d. Design Guidelines

In addition to the specific plan, the Authority adopted the March Business Center design guidelines, setting forth standards for landscaping, parking, architecture, and other design elements. The design guidelines checklist lists specific "yes/no" questions for each design element.

The implementation committee was created to review design plan applications. "The March Business Center Implementation Committee is charged with the review of ministerial actions, consisting of the review of design plans for future development with the existing March Business Center Design Guidelines. The scope of review is limited to reviewing design issues and verifying conformance with the March Business Center Design Guidelines." Although some proposals could trigger discretionary review, "[t]he Implementation Committee's review of the proposed development, however, does not involve the exercise of judgment or deliberation but is merely a determination of whether the proposed plans conform with the existing Design Guidelines and existing land use plans."

### e. The Design Plan Application

In May 2006, Tesco's representative prepared a letter to the Authority explaining how the proposed distribution facility was consistent with the 2003 specific plan and the focused EIR and did not require further environmental review. The letter described the warehouse facilities as eventually occupying 1,925,000 square feet and 88.4 acres. Three warehouses would accommodate cold storage, dry goods storage, and manufacturing. Construction would occur in two phases. Additionally, "[n]o stationary source emissions other than natural gas and electricity are anticipated for the proposed facilities. Additional CEQA analyses and documentation will be required if future proposed uses involve stationary source emissions other than natural gas and electricity." The letter further explained how the anticipated uses would be consistent with the activities permitted by the specific plan, the focused EIR and mitigation measures, and the design guidelines. A project narrative described the distribution facility similarly.

In response, the Authority agreed the distribution facility was consistent with the 2003 final focused EIR and the specific plan and was not subject to discretionary review. The Authority scheduled it for ministerial review and approval by the implementation committee at the conclusion of the design review process.

Tesco's subsequent design plan application proposed the first phase of the distribution facility as occupying 88.4 acres or 820,400 square feet, mostly warehousing. As already described, the facility is located in the area designated by the specific plan for industrial use.

The implementation committee reviewed the design plan application and found it was consistent with the specific plan and the focused EIR. Specifically, the implementation committee found the design plan application complied with the applicable design guidelines.

Notice was posted of a public meeting on approval of the design plan application. After no public comment was received, the committee approved the application on September 11, 2006, subject to certain conditions. The Authority then filed a notice of exemption, identifying Tesco's design plan application as exempt as a ministerial action (§ 21080, subd. (b)(1); Guidelines, §§ 15268, 15369) and not a "project" because it "does not involve the exercise of judgment or deliberation, but instead involves—only a determination of whether the proposed plans conform with the existing . . . Design Guidelines and the proposed use complies with the existing . . . Specific Plan and Focused [EIR] . . . ."

After Health First filed its writ petition, the trial court ruled the approval was a discretionary action and that further unspecified environmental review was required.

### 3. Standard of Review

The standard of review for an appellate court reviewing an administrative action under these circumstances is de novo. We quote a recent pronouncement of the California Supreme Court concerning review for CEQA appeals:

"In reviewing an agency's compliance with CEQA in the course of its legislative or quasi-legislative actions, the courts' inquiry 'shall extend only to whether there was a prejudicial abuse of discretion.' (Pub. Resources Code, § 21168.5.) [Fn. omitted.] Such an abuse is established 'if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence.' (§ 21168.5; see *Western States Petroleum Assn. v. Superior Court* [(1995) 9 Cal.4th 559,] 568 [38 Cal.Rptr.2d 139, 888 P.2d 1268]; *Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 392–393 [253 Cal.Rptr. 426, 764 P.2d 278] (*Laurel Heights I*).) [Fn. omitted.]

"An appellate court's review of the administrative record for legal error and substantial evidence in a CEQA case, as in other mandamus cases, is the same as the trial court's: The appellate court reviews the agency's action, not the trial court's decision; in that sense appellate judicial review under CEQA is de novo. [Citations.]" (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 426–427 [53 Cal.Rptr.3d 821, 150 P.3d 709].)

We therefore resolve the CEQA issues by independently determining whether the administrative record demonstrates any legal error by the Authority when it deemed the design plan application to be exempt from CEQA review as a ministerial action and not a project.

### 4. Discussion

The parties have supplied the court with an extensive administrative record of 70 volumes, dating back as far as 1971, eight volumes of court proceedings and almost 300 pages of (overly) elaborate briefing. Nevertheless, the principal issue in this case is a fairly simple one: was the Authority's approval of the Tesco distribution facility a ministerial or discretionary act? Our independent review of the record convinces this court that the Authority properly made a ministerial approval of the facility.

#### a. History of Environmental Review

As described above, the reuse plan for the March property has been subject to at least four kinds of environmental review. After federal and redevelopment environmental review, CEQA review occurred in 1999 and 2003. In the general and the specific plans and the Master and focused EIR's, industrial uses like the Tesco distribution facility were anticipated and evaluated and mitigation measures were identified and approved. When Tesco sought approval for its distribution facility, it followed the procedures for submission of a design plan application. As discussed more fully below, we agree the development by Tesco in 2006 did not require further environmental review beyond that accomplished in the 1999 and 2003 CEQA project documents.[4]

#### b. Discretionary and Ministerial Actions

As all the parties agree, CEQA applies to discretionary actions but does not apply to ministerial actions: "Public Resources Code section 21080,

---

[4] As explained in Tesco and the Authority's reply briefs, the 2003 specific plan for the March Business Center, including the focused EIR, properly "tiered" off the 1999 Master EIR within five years. (Guidelines, § 15179, subd. (b).)

subdivision (a) states that the provisions of CEQA apply only to 'discretionary projects [fn. omitted] proposed to be carried out or approved by public agencies, including, but not limited to, the enactment and amendment of zoning ordinances, the issuance of zoning variances, the issuance of conditional use permits and the approval of tentative subdivision maps . . . .' . . . Section 21080, subdivision (b)(1) specifically excludes from coverage by CEQA 'ministerial projects' approved by public agencies." (*Adams Point Preservation Society v. City of Oakland* (1987) 192 Cal.App.3d 203, 206 [237 Cal.Rptr. 273]; see *Prentiss v. City of South Pasadena* (1993) 15 Cal.App.4th 85, 91 [18 Cal.Rptr.2d 641].) Furthermore, "[t]he statutory distinction between discretionary and purely ministerial projects implicitly recognizes that unless a public agency can shape the project in a way that would respond to concerns raised in an EIR, or its functional equivalent, environmental review would be a meaningless exercise." (*Mountain Lion Foundation v. Fish & Game Com.* (1997) 16 Cal.4th 105, 117 [65 Cal.Rptr.2d 580, 939 P.2d 1280].)

A ministerial action involves the application of fixed standards or objective measurements: "The term 'ministerial' is defined in the CEQA Guidelines, title 14, [California Code of Regulations], section 15369: ' "Ministerial" describes a governmental decision involving little or no personal judgment by the public official as to the wisdom or manner of carrying out the project. The public official merely applies the law to the facts as presented but uses no special discretion or judgment in reaching a decision. A ministerial decision involves only the use of fixed standards or objective measurements, and the public official cannot use personal, subjective judgment in deciding whether or how the project should be carried out. . . . A building permit is ministerial if the ordinance requiring the permit limits the public official to determining whether the zoning allows the structure to be built in the requested location, the structure would meet the strength requirements in the Uniform Building Code, and the applicant has paid his fee.' " (*Adams Point Preservation Society v. City of Oakland, supra*, 192 Cal.App.3d at p. 206.)

Another example of a ministerial act is when a decision involves final approval of a subdivision map, "the 'final administrative decision is the final administrative action approving or rejecting the tentative map, an adjudicatory decision,' since approval of a final map which substantially complies with the previously approved tentative map is a mandatory ministerial act. [Citations.]" (*Hensler v. City of Glendale* (1994) 8 Cal.4th 1, 22, fn. 11 [32 Cal.Rptr.2d 244, 876 P.2d 1043]; see *Ailanto Properties, Inc. v. City of Half Moon Bay* (2006) 142 Cal.App.4th 572, 599, fn. 17 [48 Cal.Rptr.3d 340].)

The determination of what is ministerial is most appropriately made by the public agency. (Guidelines, § 15268; *Friends of Davis v. City of Davis* (2000) 83 Cal.App.4th 1004, 1015 [100 Cal.Rptr.2d 413].)

■ In the present case, review of Tesco's design plan application by the Authority and the implementation committee involved deciding whether the application was consistent with the requirements, fixed standards, and proposed mitigation of the specific plan, the focused EIR, and the design guidelines. The implementation committee accomplished its review by completing a checklist of about 125 yes-or-no questions. In doing so, the implementation committee exercised no discretion and instead acted ministerially.

The conclusion that approval of the design plan application was a ministerial act is supported by analogous cases. In *Madrigal v. City of Huntington Beach* (2007) 147 Cal.App.4th 1375 [55 Cal.Rptr.3d 209], a case involving a series of actions for operating a wholesale nursery, the court commented that, once a conditional use permit had been approved under CEQA, subsequent approvals were not separate projects but "separate steps in the completion of the nursery development." (147 Cal.App.4th at p. 1382.) Similarly, albeit on a larger scale, the Tesco distribution facility is a separate step in implementation of the specific plan for the March Business Center.

Another analogous case is *Plan for Arcadia, Inc. v. City Council of Arcadia* (1974) 42 Cal.App.3d 712, 724 [117 Cal.Rptr. 96], holding that approval of preliminary plans for a 72-acre shopping facility was discretionary but approval of the final plans was ministerial. The Tesco distribution facility is the equivalent of the final plan for the March Business Center. The Tesco facility is not a discrete CEQA project but one component of the specific plan for the larger March Business Center. (*Friends of Davis v. City of Davis, supra*, 83 Cal.App.4th at pp. 1012–1015.)

In contrast, a project may be deemed discretionary when environmental review has not been completed and further review is anticipated. (*Miller v. City of Hermosa Beach* (1993) 13 Cal.App.4th 1118, 1138–1142 [17 Cal.Rptr.2d 408], citing *Friends of Westwood, Inc. v. City of Los Angeles* (1987) 191 Cal.App.3d 259, 267–270, 279–282 [235 Cal.Rptr. 788].) But such is not the circumstance here, where the specific plan and the focused EIR offer a comprehensive environmental review of the proposed industrial development as eventually implemented by Tesco.

Instead, unless there are substantial changes or new information affecting the specific plan, there is no justification for additional environmental review of Tesco's design plan application. (§ 21166; *Benton v. Board of Supervisors*

(1991) 226 Cal.App.3d 1467, 1478 [277 Cal.Rptr. 481], citing *Bowman v. City of Petaluma* (1986) 185 Cal.App.3d 1065, 1073 [230 Cal.Rptr. 413].) Health First argues that "[s]ection 21166 applies 'only when the question is whether more than one EIR must be prepared for what is essentially the same project.' (*Sierra Club v. County of Sonoma* (1992) 6 Cal.App.4th 1307, 1320 [8 Cal.Rptr.2d 473].) Thus this section would only apply if one were to believe the March Business Center Specific Plan and the Tesco Facility were the same project."

Health First correctly frames the issue. But we conclude the Tesco facility is part of the March Business Center. (*Maintain Our Desert Environment v. Town of Apple Valley* (2004) 124 Cal.App.4th 430, 444 [15 Cal.Rptr. 322].) The Tesco facility does not constitute a separate project for purposes of CEQA review. It is smaller in size than the area already approved for industrial use by the specific plan. It has fewer environmental impacts and no special or additional impacts not analyzed in the focused EIR.

### c.   Mitigation Measures

Health First also asserts that the Tesco facility does not comply with the mitigation plan adopted as part of the specific plan. The record, however, shows the facility was made subject to the same mitigation measures. In other words, the Tesco facility is consistent with the specific plan. (*Gentry v. City of Murrieta* (1995) 36 Cal.App.4th 1359, 1403 [43 Cal.Rptr.2d 170].)

Although Health First and Tesco each engage in detailed, painstaking, and contradictory analyses of traffic impacts, we conclude substantial evidence supports the administrative decision of the Authority that the traffic mitigation measures were made applicable to the design plan application. (*Calbeach Advocates v. City of Solana Beach* (2002) 103 Cal.App.4th 529, 536 [127 Cal.Rptr.2d 1]; § 21083.3; Guidelines, § 15183.) Similarly, the issue of air quality impact was adequately considered by the Authority and received suffcient mitigation under the specific plan and in the design plan application.

We also reject Health First's argument that the implementation of the specific plan's mitigation measures as part of the design plan for the Tesco facility was discretionary because the measures were not specifically incorporated as part of the design plan approval. Particularly, Health First argues the air quality mitigation was discretionary as it involved stationary source emissions and onsite child care facilities and many of the traffic mitigation measures were also discretionary. The record contradicts this assertion because it reflects that the mitigation measures adopted in the specific plan, unless they had been deleted, continue to apply to the Tesco facility. (*Napa Citizens for Honest Government v. Napa County Bd. of Supervisors* (2001) 91

Cal.App.4th 342, 358–359 [110 Cal.Rptr.2d 579].) The conditions of approval, attached to the design plan approval, expressly provide that Tesco must comply with the focused EIR and the specific plan. (*Tuolumne County Citizens for Responsible Growth, Inc. v. City of Sonora* (2007) 155 Cal.App.4th 1214 [66 Cal.Rptr.3d 645]; *Rio Vista Farm Bureau Center v. County of Solano* (1992) 5 Cal.App.4th 351, 377 [7 Cal.Rptr.2d 307].) Because the mitigation plan applies to the Tesco facility without alteration or modification, Health First cannot argue that the mitigation measures are being implemented in a discretionary fashion.

### d. Standing

Lastly, any challenge to the specific plan for the March Business Center should have been raised in 2003 during the CEQA review process, not years later in 2006 in opposition to the design review process. (*Temecula Band of Luiseño Mission Indians v. Rancho Cal. Water Dist.* (1996) 43 Cal.App.4th 425, 437 [50 Cal.Rptr.2d 769]; *Friends of Davis v. City of Davis, supra*, 83 Cal.App.4th at p. 1017.) Additionally, the specific plan may itself be deemed a single project as part of the 1996 military base reuse plan, which should not require any additional environmental review except under certain conditions. (§ 21083.8.1, subd. (b)(2) ["all public and private activities taken pursuant to, or in furtherance of, a reuse plan shall be deemed to be a single project"].) The specific plan may also be deemed a single project as part of the 1996 redevelopment plan. (§ 21090, subd. (b); *Citizens for Responsible Equitable Environmental Development v. City of San Diego Redevelopment Agency* (2005) 134 Cal.App.4th 598, 606–608 [36 Cal.Rptr.3d 249].) Not in 1996, 1999, or 2003 did any objector successfully challenge the March reuse plan, the redevelopment plan, the general plan, or the specific plan.

For the foregoing reasons, we agree that Health First may not have had standing in the trial court. (§ 21177.) Assuming it did not, we nevertheless have considered the case on the merits in order to achieve a final resolution in these proceedings regarding the distinction between ministerial and discretionary.

### 5. Disposition

As a final comment, we observe that much of the briefing in this case was devoted to multiple repetitions of the same points, albeit phrased slightly differently. Our analysis resolves the primary issue involving ministerial, as opposed to discretionary, approval. No further discussion is required of the other issues raised by the parties.

We reverse the judgment. Tesco and the Authority as the prevailing parties shall recover their costs on appeal.

Ramirez, P. J., and Hollenhorst, J., concurred.

Respondent's petition for review by the Supreme Court was denied August 19, 2009, S173287.