[No. A130980. First Dist., Div. Four. Apr. 20, 2012.]

SIERRA CLUB, Plaintiff and Appellant, v.
NAPA COUNTY BOARD OF SUPERVISORS et al., Defendants and
Respondents.

COUNSEL

Block, DeVincenzi & Zelazny and Kevin P. Block for Plaintiff and Appellant.

Robert Westmeyer, County Counsel, Laura J. Anderson, Deputy County Counsel; Miller Starr Regalia and Arthur F. Coon for Defendants and Respondents.

Allen Matkins Leck Gamble Mallory & Natsis, Michael Patrick Durkee, David H. Blackwell and Thomas P. Tunny as Amicus Curiae on behalf of Defendants and Respondents.

OPINION

**REARDON, J.**—In 2009 respondent Napa County Board of Supervisors[1] adopted clarifying lot line adjustment ordinance No. 1331 (Ordinance). Subject to provisos, sequential lot line adjustments are included within the definition of "lot line adjustment." (Napa County Code, § 17.02.360.) Appellant Sierra Club has facially challenged the Ordinance as violative of both the

---

[1] We refer collectively to respondents Napa County Board of Supervisors (Board) and the County of Napa as County or respondents.

Subdivision Map Act[2] (Map Act or act) and the California Environmental Quality Act[3] (CEQA). We hold that the provisions of the Ordinance allowing sequential lot line adjustments are consistent with the Map Act's exclusion of lot line adjustments from the requirements of the act. Further, since the Ordinance spells out a ministerial lot line adjustment approval process, the Ordinance is exempt from CEQA purview. Finally, we reject respondents' claim that appellant's action is time-barred. Accordingly, we affirm the judgment.

## I.  BACKGROUND

### A.  *History of Lot Line Adjustment Provisions Under the Map Act*

In 1976 the Legislature amended the Map Act to exempt from the procedures of the act any lot line adjustment between two or more adjacent parcels, where the land taken from one parcel was added to an adjacent parcel but no additional parcels were thereby created, and provided the lot line adjustment was approved by the local agency. (§ 66412, as amended by Stats. 1976, ch. 92, § 1, p. 150.) Prior to that time, some local jurisdictions required that a parcel map be filed before a conveyance could be made to effect a lot line adjustment. The amendment eliminated the need to file a parcel map for minor adjustments to lot lines between adjacent parcels. (Dept. of Real Estate, Enrolled Bill Rep. on Assem. Bill No. 2381 (1975–1976 Reg. Sess.) Mar. 26, 1976.) The legislation was also described as allowing a " 'friendly neighbor' [lot line] adjustment without going through procedures provided in the map act . . . ." (Sen. Local Gov. Com., Staff Analysis of Assem. Bill No. 2381 (1975–1976 Reg. Sess.) as amended Jan. 15, 1976.)

Fifteen years later, the Legislature enacted a bill that restricted the scope of the exemption to lot line adjustments "between four or fewer existing adjoining parcels," with the same proviso that a greater number of parcels than originally existed is not thereby created. (§ 66412, subd. (d) (section 66412(d)).) The statute further provides that the lot line adjustment must be approved by the local agency or advisory agency, and the agency's review and approval shall be limited "to a determination of whether or not the parcels resulting from the lot line adjustment will conform to the local general plan, any applicable specific plan, any applicable coastal plan, and zoning and building ordinances." (*Ibid.*)

---

[2] Government Code section 66410 et seq. Unless otherwise noted, all statutory references are to the Government Code.

[3] Public Resources Code section 21000 et seq.

B. *History of Napa Ordinances Governing Lot Line Adjustments*

In 2002 the County revised its local ordinance to coincide with the changes set forth in the amended section 66412(d), specifically reflecting that lot line adjustments involving four or fewer adjoining parcels were exempt from the Map Act. The ordinance also prohibited lot line adjustments that transformed nonbuildable parcels into buildable ones, as determined by parcel size, shape, geographic features, legal restrictions and other unspecified factors. The ordinance was silent on whether sequential adjustments affecting four or fewer parcels would be permitted.

Around December 2007, the County planning director solicited direction from the Board concerning whether sequential lot line adjustments should be permitted, and if so, to what degree. At the time there were pending applications from one owner for lot line adjustments affecting 16 contiguous parcels, in which each application only affected four parcels but were sequential in that a lot adjusted under one application was further adjusted under a sequential application. A survey of other county practices revealed that one county prohibited sequential lot line adjustments outright and another allowed them with a waiting period between each sequential application. Another option would allow sequential adjustments outright without delay. At the time, there were less than 100 instances countywide in which a single owner owned more than four contiguous parcels, but that ownership affected nearly 100,000 acres. The director recommended an ordinance allowing the processing of successive applications, but with a waiting period or delay of six to eight weeks between applications during which time the first reconfiguration would be recorded. The Board accepted the recommendation and directed staff to prepare an ordinance.

In 2008 the County received lot line adjustment applications from Calness Vintners affecting a total of six parcels located within the agricultural preserve zoning district. The Town of Yountville objected to the lot line adjustments, complaining that the adjustment of parcels adjacent to its boundaries appeared to set the stage for future residential development that would reduce agricultural use and raise other potential environmental impacts. At least one property owner appealed. At the hearing, the Board asked staff to prepare an agenda item enabling it to reconsider its position on sequential lot line adjustments specifically, and the approval process generally.

In May 2009 a draft ordinance was presented to the Board. The draft distinguished between "major" lot line adjustments dependent on discretionary approval subject to CEQA, and "minor" adjustments treated as ministerial and thus outside CEQA's purview. Sequential lot line adjustments and

adjustments requiring a variance would be considered "major," as would those entirely relocating an existing parcel, or seeking to enlarge a parcel to more than 10 acres.[4] "Sequential lot line adjustment" was defined as any readjustment of a parcel which had been previously adjusted in the past five years. As well, the draft ordinance revised the definition of "buildability" to provide further guidance as to what was a "buildable" lot eligible for adjustment.

At the hearing, the Board grappled with how to distinguish between major and minor lot line adjustments. One supervisor put it this way: "I think there is a sequential lot line adjustment that is used to subvert—to get around CEQA and that's what we . . . want to include as a major lot line adjustment, but how you distinguish that from the tractor turn around and the other adjustment that is sometimes . . . needed . . . ." The Board directed staff to develop a draft ordinance in concert with stakeholders representing a variety of interests. Four meetings were held over the summer, resulting in a substantially revised ordinance. Gone was the distinction between major and minor lot line adjustments. Additionally, all adjustments were deemed ministerial except those requiring a variance or processed concurrently with a discretionary permit. As well, the ordinance revised the definition of "buildability" and continued to authorize sequential lot line adjustments.[5]

The revised ordinance went to the planning commission in October 2009, with the commission recommending Board approval. During the hearing, the chairperson expressed concern that although the ordinance did not allow for the creation of new parcels, "maybe you're modifying something that is gonna lead to more development. And I struggle with that one philosophically . . . . [W]hat are we really doing here?"

The Board adopted the Ordinance in December 2009, with an effective date of January 7, 2010. The approvals asserted that the Ordinance was

---

[4] Ten acres is the minimum parcel size on which a winery may be built in the County. (Napa County Code, § 18.104.240, subd. B.)

[5] Specifically, the ordinance provides that "[l]ot line adjustments shall include sequential lot line adjustments, in which parcels which have been previously adjusted are subsequently readjusted, provided that the prior adjustment has been completed and resulting deeds recorded prior to the sequential lot line adjustment application being filed." (Napa County Code, § 17.02.360, subd. B.) The ordinance defines " '[l]ot line adjustment' " as "a reorientation of a property line or lines between four or fewer existing adjoining parcels, where the land taken from one parcel is added to an adjoining parcel and where a greater number of parcels than originally existed is not thereby created." (*Id.*, § 17.02.360, subd. A.)

exempt from CEQA based on a class 5 categorical exemption[6] and general rule.[7] At the hearing, questions again arose as to the ministerial/discretionary distinction, particularly where there are ministerial lot line adjustments proposed concurrently with discretionary approvals. The planning director acknowledged that "if someone wants to game the system and has the time to invest in a long process of sequential applications," an applicant could "get around this."

The Ordinance as adopted continued the County's existing administrative practice of allowing lot line adjustments impacting four or fewer parcels to readjust lots included in a prior application, provided the prior adjustments had been completed and recorded. So, too, the new Ordinance continued existing policy and practice such that line adjustments are ministerial acts not subject to CEQA.

## C. *Litigation*

Sierra Club challenged the Ordinance by a petition for writ of mandate, alleging (1) violation of the Map Act's limited lot line adjustment exemption; (2) violation of the Map Act and CEQA due to classifying all lot line adjustment approvals as ministerial; (3) violation of CEQA's prohibition on piecemealing; and (4) that the Ordinance did not qualify for any CEQA exemption.

Sierra Club requested that the County stipulate to a court order extending its time to prepare the record, pursuant to Public Resources Code section 21167.6, subdivision (c). The County agreed and the court ordered that the deadline to prepare the record was extended to May 14, 2010.

The County demurred on grounds that Sierra Club failed to effect summons within 90 days of the decision, as required by section 66499.37, for any proceeding challenging a decision "concerning a subdivision." (*Ibid.*) Overruling the demurrer, the trial court held that the County's stipulation to extend time to prepare the record amounted to a general appearance, and thus the County waived any irregularities in the service of summons.

---

[6] A class 5 exemption "consists of minor alterations in land use limitations in areas with an average slope of less than 20%, which do not result in any changes in land use or density, including but not limited to: [¶] (a) Minor lot line adjustments . . . ." (Cal. Code Regs., tit. 14, § 15305 (hereafter Regulations).)

[7] A project is exempt from CEQA if "[t]he activity is covered by the general rule that CEQA applies only to projects which have the potential for causing a significant effect on the environment. Where it can be seen with certainty that there is no possibility that the activity in question may have a significant effect on the environment, the activity is not subject to CEQA." (Regs., § 15061, subd. (b)(3).)

Thereafter the court denied the petition on the merits, ruling that the language of the Map Act was clear on its face and did not bar sequential lot line adjustments. It concluded that while the legislative history of the applicable amendment demonstrated a concern over unfettered land reconfiguration through the lot line adjustment process, it was plausible that rather than seeking to ban all sequential lot line adjustments, the Legislature was attempting to find a balance for "an appropriate pace of land reconfiguration." (Italics omitted.) Further, the court ruled that because the County's approval of lot line adjustments was constrained under the Map Act and the Ordinance, such approvals were ministerial and not subject to CEQA. The court further found that the County's adoption of the Ordinance came within the "common sense" CEQA exemption. In this regard, it noted that there was substantial evidence that the ministerial approval of sequential lot line adjustments was already legal and practiced by the County, and thus there was no possibility of affecting the physical environment.

## II. DISCUSSION

A. *Sierra Club's Action Was Not Time-barred*

The County raises an issue of error concerning the trial court's nonappealable order overruling its demurrer, continuing to press that Sierra Club's action is time-barred. It is proper to raise this issue in the respondent's brief. (See *Selger v. Steven Brothers, Inc.* (1990) 222 Cal.App.3d 1585, 1593–1594 [272 Cal.Rptr. 544].) Nevertheless, the ruling was correct.

In March 2010, pursuant to Public Resources Code section 21167.6, subdivision (c), the County stipulated to entry of an order by the trial court extending the time for preparing, certifying and lodging the administrative record. That statute provides for an extension "only upon the stipulation of all parties who have been properly served in the action or proceeding or upon order of the court." (*Ibid.*)

■ The County's action of agreeing in writing that the court had authority to enter an order extending the record preparation deadline constituted a general appearance. A general appearance waives any irregularities and is equivalent to personal service of the summons on a party. (Code Civ. Proc., § 410.50.) The list of acts constituting an appearance set forth in Code of Civil Procedure section 1014 (e.g., answering, demurring, moving to strike or transfer) is not exclusive. Instead, the determining factor is " 'whether defendant takes a part in the particular action which in some manner recognizes the authority of the court to proceed.' [Citation.]" (*Hamilton v. Asbestos Corp.* (2000) 22 Cal.4th 1127, 1147 [95 Cal.Rptr.2d 701, 998 P.2d 403].)

Here, the County took part in the action by stipulating in writing to an order granting Sierra Club a 60-day extension to prepare the administrative record. That action acknowledged the authority of the court to grant the extension and foreshadowed certification of the record by the County so that a certified record could be lodged with the court, a necessary precondition for a hearing. As such, the action constituted a general appearance and waived all irregularities.

## B. *No Map Act Conflict*

■ Sierra Club is adamant that the Ordinance violates the Map Act by negating its limited exemption for lot line adjustments. This essentially is a claim that section 66412(d) preempts the local lot line adjustment Ordinance because the Ordinance facially conflicts with the statutory exclusion. Not so.

Section 66412(d) states that the Map Act shall be inapplicable to "[a] lot line adjustment between four or fewer existing adjoining parcels, where the land taken from one parcel is added to an adjoining parcel, and where a greater number of parcels than originally existed is not thereby created, if the lot line adjustment is approved by the local agency, or advisory agency. A local agency or advisory agency shall limit its review and approval to a determination of whether or not the parcels resulting from the lot line adjustment will conform to the local general plan, any applicable specific plan, any applicable coastal plan, and zoning and building ordinances. An advisory agency or local agency shall not impose conditions or exactions on its approval of a lot line adjustment except to conform to the local general plan, any applicable specific plan, any applicable coastal plan, and zoning and building ordinances, to require the prepayment of real property taxes prior to the approval of the lot line adjustment, or to facilitate the relocation of existing utilities, infrastructure, or easements. No tentative map, parcel map, or final map shall be required as a condition to the approval of a lot line adjustment. . . . The lot line adjustment shall be reflected in a deed, which shall be recorded. . . ."

■ A municipality such as the County "may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws." (Cal. Const., art. XI, § 7.) It is this constitutional police power which confers on municipalities the authority to enact land use regulations and control their own land use decisions. (*Associated Home Builders etc., Inc. v. City of Livermore* (1976) 18 Cal.3d 582, 604 [135 Cal.Rptr. 41, 557 P.2d 473].) Under the police power, municipalities "have plenary authority to govern, subject only to the limitation that they exercise this power within their territorial limits and subordinate to state law. [Citation.] . . . [¶] If otherwise valid local legislation conflicts with state law, it is

preempted by such law and is void." (*Candid Enterprises, Inc. v. Grossmont Union High School Dist.* (1985) 39 Cal.3d 878, 885 [218 Cal.Rptr. 303, 705 P.2d 876].) Facial challenges to legislation are the most difficult to successfully pursue because the challenger must demonstrate that " ' "no set of circumstances exists under which the [law] would be valid." ' [Citation.]" (*T.H. v. San Diego Unified School Dist.* (2004) 122 Cal.App.4th 1267, 1281 [19 Cal.Rptr.3d 532], italics omitted.) Thus, the moving party must establish that the challenged legislation inevitably is in total, fatal conflict with applicable prohibitions. (*Ibid.*)

When local municipalities regulate in areas over which they traditionally have exercised control, our courts presume, absent a clear preemptive intent from the Legislature, that such regulation is not preempted by state law. (*Big Creek Lumber Co. v. County of Santa Cruz* (2006) 38 Cal.4th 1139, 1149 [45 Cal.Rptr.3d 21, 136 P.3d 821].) Local land use regulations conflict with general laws and are void if the local legislation duplicates, contradicts, or enters an area occupied fully by the general law. Local legislation is contradictory to general law when it is inimical to it. (*Id.* at p. 1150.)

The Ordinance does not conflict with section 66412(d). First, according to the plain, clear and unambiguous language of the statute, the Legislature has excluded from the Map Act lot line adjustments meeting the following criteria: (1) the adjustment is between four or fewer parcels; (2) the parcels must be adjoining; (3) the adjustment does not result in more parcels than originally existed; and (4) the lot line adjustment is approved by the local agency. The Ordinance's inclusion of sequential lot line adjustments within the definition of a "lot line adjustment" does not run afoul of any of these criteria and hence should likewise be exempt from the Map Act. Sequential lot line adjustments are only allowed in cases where a prior adjustment involving four or fewer adjoining parcels has been completed and approved; no new parcels have been created; and deeds reflecting the adjustment have been recorded prior to any sequential lot line application being filed.

Second, Sierra Club's insistence that the County distorts the plain language of the statute by inserting the word "application" into it is not persuasive. The County is not "inserting" the term "application" into the statute. Rather, the term "sequential lot line adjustment" is defined in part with reference to the timing of a sequential lot line application. Timing is important because there will be no sequential lot line adjustment or application for the same unless the prior adjustment has been completed and deeds have been recorded reflecting the initial adjustment. This issue of timing comports with section 66412(d), notably the requirement that qualifying adjustments pertain to existing adjoining parcels and the directive that the adjustment be reflected in a recorded deed.

To make its point, Sierra Club declares: "To adjust the boundaries of 16 parcels by submitting four applications affecting four parcels each is gamesmanship. A straightforward reading of the statute requires the County to disregard such artifice, and look instead at the aggregate number of parcels whose boundaries are to be adjusted." (Fn. omitted.) There are several problems with this statement. First, four applications affecting four parcels each would not be submitted at the same time. Rather, each application would have to result in recorded deeds and the approval standards for the adjustment would have to be met, including that the adjustment will not result in a nonbuildable parcel becoming buildable,[8] parcels will not be reduced below certain minimum standards, and the like. (Napa County Code, § 17.46.040.) More to the point, Sierra Club illustrates its argument with an as-applied example, but its attack on the Ordinance is facial.[9] The challenger mounting a facial attack must show that the defective regulation presently poses a total and fatal conflict. (*T.H. v. San Diego Unified School Dist., supra,* 122 Cal.App.4th at p. 1281; see *Association of California Ins. Cos. v. Poizner* (2009) 180 Cal.App.4th 1029, 1054 [103 Cal.Rptr.3d 458].) Sierra Club cannot meet this burden. In any event, we are not reviewing the approval of the proffered illustration, and we surmise that a variety of attacks on purported gamesmanship might be available.

Next, Sierra Club prods us to review the legislative history, which it maintains evinces an unmistakable intent to curtail the scope of the exemption. In essence appellant suggests section 66412(d) is ambiguous in light of the Ordinance, because the statute is silent on the matter of sequential lot line adjustments. As the trial court did, in an abundance of caution we will take a look at that history.

We begin with case law, namely *San Dieguito Partnership v. City of San Diego* (1992) 7 Cal.App.4th 748 [9 Cal.Rptr.2d 440], involving a prior iteration of the statute which exempted lot line adjustments " 'between two or more existing adjacent parcels' " with the proviso that the adjustment not result in a greater number of parcels than originally existed. (*Id.* at p. 751.) There, the owners sought reconfiguration of their nine parcels, five of which had no frontage to a street, so all would have street frontage. The trial court found that the exemption was intended only to apply to minor changes in parcel lines and there was a limit to the number of lots that could be adjusted under the exemption. (*Id.* at p. 754.) Reversing, the reviewing court held that the only numerical limitation on parcels that could be included in a lot line

---

[8] To be considered buildable, a parcel must meet the following criteria: (1) it must contain a minimum of 2,400 square feet of net lot; (2) it must have existing access rights to a public street; and (3) the parcel must contain a building site, by definition a minimum of 25 feet wide and 25 feet deep. (Napa County Code, § 17.46.040, subd. C.3.a.–c.)

[9] The same can be said for the case law cited, which likewise involves as-applied challenges.

adjustment is that the adjustment not result in the creation of more parcels than originally existed, commenting that had the Legislature been interested in limiting the number of parcels which could be subject to an adjustment, "[i]t surely would have been an easy task to attach such a limit . . . ." (*Id.* at p. 757.)

Such a limit came with the 2001 amendments to section 66412(d), limiting the exemption to adjustments between four or fewer parcels. The enrolled bill memorandum summarizes arguments in support of the amendments: "This bill closes a loophole in the [Map Act] that allows major subdivisions of land to occur without adequate local review. This practice has resulted in inappropriate new development that does not comply with local general planning, does not provide adequate infrastructure such as sewers and roads, and does not meet affordable housing requirements of approved general plans." (Enrolled Bill Mem. to Governor on Sen. Bill No. 497 (2001–2002 Reg. Sess.) Sept. 24, 2001.) Another report further explained that developers and land speculators recently have " 'changed the landscape' by exploiting loopholes in the . . . Map Act. Although many antiquated parcels are inconsistent with minimum lot size and development requirements, lot line adjustments are now used as an exception to the usual requirements for subdivision approval in order to effectively 'resubdivide' the property without providing infrastructure or conforming to community land use plans. By this method, antiquated subdivision owners reconfigure their parcels and make them buildable merely by obtaining certificates of compliance and processing a lot line adjustment. . . . This allows speculators to avoid not only the Map Act but also infrastructure, general plan, specific plan, local coastal plan, and [CEQA] requirements that would otherwise apply." (Governor's Off. of Planning & Research, Enrolled Bill Rep. on Sen. Bill No. 497 (2001–2002 Reg. Sess.) Oct. 3, 2001, p. 2, underscoring omitted.) The report went on to state that the same "end run around state law and local regulations" occurred in new subdivisions, in which developers would apply for lot line adjustments at some point that resulted in dramatic impacts with significant environmental effect, with no CEQA review and the like. (Governor's Off. of Planning & Research, Enrolled Bill Rep. on Sen. Bill No. 497 (2001–2002 Reg. Sess.), *supra*, at p. 3.)

Sierra Club intones that the Ordinance has "reopened" the loophole that the section 66412(d) amendments were intended to close, by folding sequential lot line adjustments into the permissible lot line adjustments that are exempt from the Map Act. The legislative history sampled above reveals that there were a number of concerns with unchecked land reconfiguration through inappropriate lot line adjustments that circumvented state and local review. However, we do not divine an intent to bring all sequential lot line adjustments within the Map Act's ambit. The Ordinance does not allow an endless stream of lots to be adjusted at one time, nor does it allow a nonbuildable

parcel to become buildable through the adjustment process. The requirements that a landowner must obtain approval of adjustments of no more than four adjoining lots at one time, then record the deeds reflecting those adjusted lots before filing and processing another application, serve the purpose of deterring simultaneous adjustment of unlimited parcels, while still fostering the benefits served by a simple lot line adjustment process. The sequential lot line adjustment process set forth in the Ordinance injects meaningful temporal constraints on larger scale lot line adjustments. We concur with the trial court's conclusion that it was plausible the Legislature "was seeking to strike a balance for an appropriate pace of land reconfiguration through the use of lot line adjustments, whether for potential development or otherwise. . . . [T]he language of the 2001 amendment does dictate a slower rate of reconfigurations through adjustments than could occur under the former language of the statute. Curtailing, without prohibiting such lot line adjustments may well have been precisely the legislature's intent in implementing the language it chose for the amendment. Certainly, if the legislature had intended to bring all sequential lot line adjustments within the purview of the Map Act, it easily could have used alternative language to make that intention clear." (Italics omitted.)

### C. The Approval of Sequential Lot Line Adjustments Under the Ordinance Is Not Subject to CEQA

Sierra Club insists that the approval of a sequential lot line adjustment is a discretionary act within the meaning of CEQA, and thus subject to the act's requirements. We disagree.

#### 1. Legal Framework

■ As a general matter, CEQA applies to all discretionary projects[10] proposed or approved by a public agency that do not fall within a statutory exemption. (Pub. Resources Code, § 21080, subd. (a).) A " '[d]iscretionary project' " is a project the approval or disapproval of which requires exercise of judgment or deliberation, as contrasted with situations in which the public agency merely determines whether the project conforms with applicable statutes, ordinances or regulations. (Regs., § 15357.) CEQA will apply where the public agency uses its judgment in deciding not only whether to approve, but also how to carry out, a proposed project. (Regs., § 15002, subd. (i).)

■ On the other hand, ministerial projects are exempt from CEQA requirements. (Pub. Resources Code, § 21080, subd. (b)(1); Regs., § 15268,

---

[10] Under CEQA, a "project" is "an activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment" that is undertaken or supported by a public agency or involves issuance of an entitlement for use by a public agency. (Pub. Resources Code, § 21065.)

subd. (a).) Determining what is "ministerial" for CEQA purposes is most appropriately made by the public agency involved in a particular decision, based on the agency's analysis of its own laws, and each agency preferably should make this determination as part of its implementing regulations or ordinances. (Regs., § 15268, subds. (a), (c).) Whether a particular agency exercises discretionary or ministerial controls over a project "depends on the authority granted by the law providing the controls over the activity." (*Id.,* § 15002, subd. (i)(2).)

The term "ministerial" refers to a public agency's decisions "involving little or no personal judgment by the public official as to the wisdom or manner of carrying out the project. The public official merely applies the law to the facts as presented but uses no special discretion or judgment in reaching a decision. A ministerial decision involves only the use of fixed standards or objective measurements, and the public official cannot use personal, subjective judgment in deciding whether or how the project should be carried out." (Regs., § 15369.)

2. *Analysis*

In keeping with the CEQA guidelines (Regs., § 15000 et seq.), the Ordinance classifies lot line adjustments as ministerial acts, as follows: "The tentative approval of lot line adjustments and subsequent review and approval of deeds are ministerial acts and not subject to CEQA; except that the tentative approval of lot line adjustments are discretionary and subject to CEQA when[, (a)] the lot line adjustment requires the approval of a variance . . . ; or [(b)] is processed concurrently with [a related] application for a use permit or other discretionary approval . . . ." (Napa County Code, § 17.46.020.) Additionally, the County's local procedures for implementing CEQA lists lot line adjustments among the approvals "conclusively presumed to be ministerially exempt from the requirements of CEQA . . . ."

Applications that comply with 12 specified standards are deemed to conform to the general plan, any specific plan, and county zoning and building ordinances, and *must be* approved.[11] (Napa County Code,

---

[11] These standards include the following: (1) the lot line adjustment will result in the transfer of not more than four existing, adjoining legal parcels; (2) the adjustment will not result in a greater number of parcels than originally existed; (3) a nonbuildable parcel will not be made buildable by the adjustment; (4) the lot line adjustment will not reduce parcels that equal or exceed a minimum parcel size established by the applicable zoning district or designated by the Ordinance below the pertinent minimum or set size, unless a corresponding number of parcels that are (a) smaller than such minimum, (b) included within the lot line adjustment and (c) located in the same zoning district will be increased to exceed such minimum size; (5) subject to exception, the resultant parcel will not be bisected or internally severed by a road previously dedicated for public use; (6) unless waived by a granted variance, the resultant

§ 17.46.040, subd. C.) The only condition of approval that the director of public works can impose is a deed condition to ensure that standard (11) above is satisfied prior to recording the deed/s consummating the adjustment. (*Ibid.*)

Sierra Club argues we should not pay any deference to the County's classification of sequential lot line adjustments, but surely that is not the law. Otherwise, why would the governing regulations acknowledge that the local public agency is the most appropriate entity to determine what is ministerial, based on analysis of its own laws and regulations, and urge that the agency make that determination in *its* implementing regulations? (Regs., §§ 15022, subd. (a)(1)(B), 15268, subds. (a), (c).)

■   Sierra Club also maintains that CEQA requires individualized decisions concerning lot line adjustments, decisions that are inherently discretionary. Appellant misunderstands the distinction between discretionary and ministerial decisions. "The statutory distinction between discretionary and purely ministerial projects implicitly recognizes that unless a public agency can shape the project in a way that would respond to concerns raised in an [environmental impact report], or its functional equivalent, environmental review would be a meaningless exercise." (*Mountain Lion Foundation v. Fish & Game Com.* (1997) 16 Cal.4th 105, 117 [65 Cal.Rptr.2d 580, 939 P.2d 1280]; see *Health First v. March Joint Powers Authority* (2009) 174 Cal.App.4th 1135, 1143 [96 Cal.Rptr.3d 290] (*Health First*).) *Health First* involved a challenge to the review of a grocer's design plan application for a large warehouse distribution facility. Review of the plan entailed deciding whether the application was in keeping with the requirements, fixed standards and proposed mitigation measures set forth in the specific plan, the environmental impact report and the design guidelines. The review team accomplished its mission by completing a checklist of 125 yes or no questions. As such it exercised no discretion and instead acted ministerially. (*Health First, supra,* at p. 1144.)

---

parcels will comply with all parcel design provisions in the zoning ordinance; (7) the resultant parcels will have legal access to a publicly maintained road, as shown on the application map; (8) no public utility easement shown on a final or parcel map will be adversely affected by the adjustment; (9) the size of an adjusted parcel that will use an individual sewage system must equal or exceed the minimum parcel size established by the applicable code; (10) if the adjustment reduces a parcel greater than 10 acres to less than 10 acres, the resulting parcel must be connected to a public sewer or be suitable for an onsite sewage disposal system or qualify for such system on an abutting parcel; (11) subject to exception, after recordation of the deed consummating the adjustment, no recorded security interest will encumber only a portion of any resulting parcel; and (12) the transfer of property from one parcel to the adjoining parcel will not enable more parcels to be created through future subdivision than could have been created through merger and resubdivision of the original parcels. (Napa County Code, § 17.46.040, subd. C.)

The ministerial/discretionary distinction has also been framed this way: "As applied to private projects, the purpose of CEQA is to minimize the adverse effects of new construction on the environment. To serve this goal the act requires assessment of environmental consequences where government has the power through its regulatory powers to eliminate or mitigate one or more adverse environmental consequences a study could reveal. Thus the touchstone is whether the approval process involved allows the government to shape the project in any way which could respond to any of the concerns which might be identified in an environmental impact report. And when is government foreclosed from influencing the shape of the project? Only when a private party can legally compel approval without any changes in the design of its project which might alleviate adverse environmental consequences." (*Friends of Westwood, Inc. v. City of Los Angeles* (1987) 191 Cal.App.3d 259, 266–267 [235 Cal.Rptr. 788], italics omitted (*Friends of Westwood*).)

■ Following *Friends of Westwood*, the court in *Leach v. City of San Diego* (1990) 220 Cal.App.3d 389, 394–395 [269 Cal.Rptr. 328] held that a municipality was not required to prepare an environmental impact report before being permitted to draft water from a reservoir; despite environmental consequences, the municipality had little or no ability to minimize in any significant way the environmental damages that might be identified in the report. As one reviewing court recently put it, quoting from a major treatise: " 'CEQA does not apply to an agency decision simply because the agency may exercise some discretion in approving the project or undertaking. Instead to trigger CEQA compliance, the discretion must be of a certain kind; it must provide the agency with the ability and authority to "mitigate . . . environmental damage" to some degree. [Citations.]' " (*San Diego Navy Broadway Complex Coalition v. City of San Diego* (2010) 185 Cal.App.4th 924, 934 [110 Cal.Rptr.3d 865], italics omitted (*San Diego Navy*).)

■ Here, the Map Act exempts from discretionary reviews, exactions and conditions those lot line adjustments that fit the specifications of section 66412(d). Local agency review is expressly limited to determining whether the resulting lots will conform to the local general plan, any applicable specific or coastal plan, and building and zoning ordinances. (*Ibid.*) Section 66412 describes a prototypical ministerial approval process, and indeed approval of a lot line adjustment application has been characterized as involving "only a ministerial decision," as contrasted with a subdivision proposal. (*Loewenstein v. City of Lafayette* (2002) 103 Cal.App.4th 718, 721 [127 Cal.Rptr.2d 79].) In other words, "the regulatory function of the approving agency is strictly circumscribed by the Legislature in a lot line adjustment, with very little authority as compared to the agency's function and authority in connection with a subdivision." (*San Dieguito Partnership v. City of San Diego, supra*, 7 Cal.App.4th at p. 760.)

In keeping with section 66412(d), the procedure for approving lot line adjustments under the Ordinance involves only ministerial acts unless a variance or use permit is involved. The fixed approval standards delineate objective criteria or measures which merely require the agency official to apply the local law—e.g., building and zoning code provisions—to the facts as presented in a given lot line adjustment application. (Regs., § 15369.) The approval process is one of determining conformity with applicable ordinances and regulations, and the official has no ability to exercise discretion to mitigate environmental impacts. (*Id.*, § 15357; *San Diego Navy, supra*, 185 Cal.App.4th at p. 934.)

Sierra Club cites *La Fe, Inc. v. County of Los Angeles* (1999) 73 Cal.App.4th 231 [86 Cal.Rptr.2d 217] for the notion that lot line adjustments can affect development potential, and thus their approval constitutes a project subject to CEQA. However, CEQA only applies to *discretionary* projects, and we have determined that lot line adjustments under the Ordinance entail only ministerial acts. The *La Fe* court found that lot line adjustments constituted development under the California Coastal Act of 1976 (Pub. Resources Code, § 30000 et seq.) that fell within the permit jurisdiction of the California Coastal Commission, and as such the commission had jurisdiction to deny the owner's application for a coastal development permit or waiver. (73 Cal.App.4th at pp. 239–242.) *La Fe* involved primarily the authority of a *state agency*—the California Coastal Commission—over "development" as defined distinctly in the *California Coastal Act of 1976* to include "any other division of land, including lot splits . . . ." (Pub. Resources Code, § 30106.) The issue of statutory interpretation posed by *La Fe* is thus inapposite to the case at hand. Further, the lot line adjustment in question would have made all the lots accessible to a public street, but the street could not facilitate adequate access to the lots by firefighting equipment. On the other hand, the Ordinance would not allow such an outcome, because it prohibits lot line adjustments that render a nonbuildable parcel buildable, and defines buildable as including access rights to a public street. (Napa County Code, § 17.46.040, subd. C.)

Finally, it bears pointing out that the Ordinance did nothing to change existing land use policies and regulations in the County's general plan and building and zoning ordinances, and it in fact codified the County's existing legal practice of allowing Map Act exempt sequential lot line adjustments that conform to other laws to be approved ministerially. Thus the Ordinance does not enable any development beyond what already is possible through existing land use policies and zoning laws.

## III.  DISPOSITION

In light of our conclusion that the approval of a lot line adjustment under the Ordinance is a ministerial act and thus not subject to CEQA, we need not consider Sierra Club's remaining CEQA arguments.

The judgment is affirmed. Parties to bear their own costs on appeal.

Ruvolo, P. J., and Sepulveda, J.,[*] concurred.

---

[*]Retired Associate Justice of the Court of Appeal, First Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.